IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| URL PHARMA, INC., MUTUAL PHARMACEUTICAL COMPANY, INC., and UNITED RESEARCH LABORATORIES, INC., | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. _____ |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) ) | |
| RECKITT BENCKISER INC., | ) ) | |
| Defendant. | | |

## COMPLAINT

Plaintiffs URL Pharma, Inc., Mutual Pharmaceutical Company, Inc., and United Research Laboratories, Inc. (collectively, "Mutual" or "Plaintiff"), by and through their attorneys, for their Complaint against Defendant Reckitt Benckiser Inc. ("Reckitt" or "Defendant") for damages and injunctive relief state the following:

## NATURE OF THE CASE

1.      This is a civil antitrust action for injunctive relief and damages arising from Reckitt's wrongful monopolization and attempt to monopolize the market for extended-release guaifenesin ("ERG"), an over-the-counter drug.  Reckitt sells ERG under the brand name Mucinex®.  Reckitt's intentional conduct has deliberately blocked the formation of a competitive generic market for the manufacture and sale of ERG, and has improperly preserved and extended Reckitt's ability to extract monopoly profits from the consumer marketplace for ERG.  Reckitt's conduct has imposed many millions of dollars of illegal monopoly charges on consumers.

1

2.      In 2007, the parties (Reckitt by its predecessor, together referred to herein as "Reckitt") entered into a settlement agreement resolving then pending litigation between Reckitt and Mutual.  That litigation arose because Reckitt held the patent for the only FDA-approved form of ERG.  At the time of that litigation, Mutual was planning to manufacture and sell a generic version of ERG, thereby ending Reckitt's monopoly.  In anticipation of Mutual's entry into the market, Reckitt sued Mutual in 2006 for patent infringement.  The 2007 settlement agreement was the result of the parties' assessment of litigation risk and cost associated with Reckitt's patent claims.  It required Mutual to refrain from entering the ERG market until, *inter alia*, another generic manufacturer began offering generic ERG.  In that event, Reckitt agreed that it would then supply ERG to Mutual so that Mutual, too, would be able to enter the generic ERG market.

3.      Mutual has performed all of its obligations under the settlement agreement.

4.      In October 2013, Mutual made demand on Reckitt to supply Mutual with generic ERG product because another generic manufacturer had offered a generic ERG product in the marketplace.  The amount of generic ERG that the third party was able to manufacture, however, was limited, and its ability to manufacture generic ERG was unreliable.  For an extended period, after initially delivering product to the market, it could not produce any generic ERG product.  The impact on Reckitt was, as a result, modest, but under the 2007 settlement agreement the entry into the market of this generic product triggered Reckitt's obligation to supply ERG to Mutual.  Reckitt, however, has refused to honor its end of the settlement agreement with Mutual.  It has refused to supply Mutual with ERG and, after having received the benefit of its bargain with Mutual for over 7 years, has now repudiated the settlement agreement.

Case 2:15-cv-00505-PBT   Document 1   Filed 02/03/15   Page 3 of 17

5.      Reckitt's conduct has been an attempt to illegally extend its monopoly position and to continue to extract monopoly profits from the consuming public. Reckitt has sought to eliminate, or substantially limit, generic competition with its branded ERG product. By repudiating its settlement and supply agreement with Mutual, Reckitt stands to pay as damages to Mutual only Mutual's lost profits on ERG product that would have been sold at generic prices. But Reckitt knows that its monopoly ERG price, and profits obtained therefrom, far exceed what the generic ERG price, and profits, would be. There is a substantial net benefit to Reckitt if it continues to extract monopoly profits from consumers during the years of delay caused by its repudiation of its settlement agreement with Mutual and the subsequent litigation, even if Reckitt ultimately has to pay contract damages to Mutual.

6.      Moreover, Reckitt's decision to monetize the cost of its refusal to supply ERG to Mutual through a damage payment in litigation is the illegal conversion by Reckitt of a settlement contract intended to create competition into a deferred payment of money to Mutual.

7.      Mutual seeks injunctive relief to prevent Reckitt's illegal, monopolistic practices, plus treble damages, attorneys' fees and such other damages as may be appropriate.

8.      This is also a breach of contract action that relates to Reckitt's breach of its agreement to sell ERG to Mutual. Mutual seeks, among other relief, specific performance and damages resulting from Reckitt's continuing breach of the 2007 settlement agreement. Mutual also seeks declaratory relief finding that Reckitt is wrong to have repudiated its settlement agreement with Mutual.

## PARTIES

9.      URL Pharma, Inc. is a corporation organized and existing under the laws of Delaware with its principal place of business in New Jersey. URL Pharma, Inc. is the successor

3

in interest to Pharmaceutical Holdings Corp., a company formerly organized and existing under the laws of Delaware.

10.     Mutual Pharmaceutical Company, Inc. is a corporation organized and existing under the laws of Delaware with its principal of business in New Jersey.  Mutual Pharmaceutical Company, Inc. is the successor in interest to Mutual Pharmaceutical Co., Inc., a corporation formerly organized and existing under the laws of Pennsylvania.

11.     United Research Laboratories, Inc. is a corporation organized and existing under the laws of Pennsylvania with its principal place of business in New Jersey.

12.     Upon information and belief, Reckitt is a corporation organized and existing under the laws of Delaware with its principal place of business in New Jersey.

## JURISDICTION AND VENUE

13.     This Complaint arises under, *inter alia*, the Antitrust Laws of the United States, particularly the Sherman Antitrust Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. §§ 15 and 26.

14.     This Court has subject matter jurisdiction over this Complaint pursuant to 28 U.S.C. §§ 1331, 1337, 2201 and 2202.  This Court has supplemental jurisdiction over the state law claims of this Complaint pursuant to 28 U.S.C. § 1367.

15.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c).

16.     The parties have expressly consented to the jurisdiction of this Court and to this venue.

## FACTUAL ALLEGATIONS

### THE UNDERLYING LITIGATION AND RECKITT'S REFUSAL TO HONOR THE TERMS OF THE SUBSEQUENT SETTLEMENT AND LICENSE AGREEMENT.

17.     Guaifenesin is an expectorant that helps thin bronchial secretions to clear the bronchial passageways of mucus in order to make coughs more productive.   Although *immediate-release* guaifenesin products were available from a number of different drug manufacturers, Reckitt ERG products, marketed as Mucinex® extended-release products, were the only extended-release guaifenesin products consumers could purchase throughout the United States during the relevant time periods.

18.     Prior to March 21, 2007, Mutual was engaged in litigation with Adams Respiratory Therapeutics, Inc., Adams Respiratory Operations, Inc., and Adams Respiratory Products, Inc. (referred to collectively herein as "Adams") over the issue of whether Mutual infringed Adams' patent covering certain ERG products.

19.     On March 21, 2007, for good and valuable consideration, Mutual and Adams executed a written settlement agreement settling their dispute.  A copy of that writing is attached hereto as Exhibit A.

20.     On September 10, 2009, Mutual and Adams executed an Amendment to that settlement agreement (the "Amendment").   A copy of the Amendment is attached hereto as Exhibit B.  The Amendment acknowledges that Adams merged into Reckitt at some time after execution of the agreement.  As a consequence of the merger, Reckitt assumed the rights and obligations of Adams under the settlement agreement. (The settlement agreement, as updated by the Amendment, will be referred to hereafter as the "Settlement Agreement.")

21.     In the Settlement Agreement, the parties agreed that, in light of litigation risk and cost, Mutual would not enter the ERG market until, *inter alia*, another generic manufacturer

entered the ERG market.  Reckitt would then have to supply Mutual with its ERG drug products for resale by Mutual as Authorized Generic versions of Mucinex®.  An Authorized Generic is a generic drug product sold under a brand's New Drug Application, or NDA.  An Authorized Generic is unique in that it is identical to the brand in all, or nearly all respects.

22.     By October 2013, a third party, Perrigo Company PLC ("Perrigo") had been legally selling and delivering to the market a generic version of the Mucinex® 600 mg ERG product.

23.     Perrigo's launch of generic ERG product triggered Reckitt's obligation to supply Reckitt's 600 mg ERG product to Mutual.

24.     On October 24, 2013, Mutual provided Reckitt written notice that, under the Settlement Agreement, it was electing to purchase from Reckitt 600 mg ERG product for resale by Mutual.

25.     Reckitt has continuously refused to supply such tablets to Mutual and has expressly repudiated any obligation to supply Mutual with such tablets.  Both Mutual and consumers of ERG products have been and continue to be harmed by Reckitt's refusal to supply a 600 mg version of the Mucinex® product under the terms of the Settlement Agreement.

**RECKITT'S REFUSAL TO SUPPLY MUTUAL WITH
ERG PRODUCT IS IMPROPER ANTICOMPETITIVE BEHAVIOR.**

26.     Reckitt understands that if it had met its obligation under the Settlement Agreement to supply Mutual with its ERG product, it would have lost its ability to freely extract monopoly profits from the market.

27.     Reckitt continues to refuse to supply Mutual with its ERG product.  In refusing to supply Mutual, Reckitt has improperly extended its monopoly in the ERG market.  If Reckitt had supplied Mutual as it was obligated to do, Mutual could have entered the ERG market with a

generic product that would have created product and price competition for Reckitt's branded ERG product. Had Mutual been in a position to supply the market with a competing product and to create competitive pricing, both Mutual and consumers of ERG products would have enjoyed substantial economic benefits. During periods of time when Mutual may have been the only generic competitor, competition with Reckitt would have created economic benefit for consumers. If another generic competitor had been present along with Mutual, even greater economic benefit would have been realized by consumers.

28.    Reckitt's (i) agreement to resolve its disputed patent rights by entering into a pro-competitive Settlement Agreement wherein it promised to supply Mutual with ERG; (ii) its acceptance of the benefits of the Settlement Agreement for a period of 7 years, and (iii) its subsequent repudiation of that same Settlement Agreement in order to force the parties into further litigation while it has continued to extract monopoly profits from the market, is improper anticompetitive behavior and is an illegal extension of what were the proper limits of Reckitt's monopoly power pursuant to its patent rights.

## THE RELEVANT MARKET AND RECKITT'S MARKET POWER.

29.    The relevant product market is the market for extended-release guaifenesin, or ERG, products.

30.    Guaifenesin is the only FDA-approved expectorant consumers can purchase over the counter to thin bronchial secretions. There are no known unapproved drugs in the same therapeutic class as guaifenesin, and there are no known expectorants in drug development that might emerge and compete with guaifenesin in the future. Single ingredient guaifenesin products are typically shelved separate and apart from other cold and flu remedies, further demonstrating the unique therapeutic category occupied by guaifenesin products.

31.     Other available cold remedies, including cough remedies, work differently to help mask symptoms of cold and flu.  Most available remedies serve to (1) numb the throat so as to inhibit the cold reflex, (2) act as decongestants so as to dry mucus membranes and prevent nasal discharge, or (3) alleviate aches and pains associated with cold and flu.  None of the available cold and flu remedies are acceptable substitutes for guaifenesin's ability to thin bronchial secretions.  Alternative remedies only serve to mask symptoms, are ineffectual or can cause serious side effects not associated with guaifenesin.  For example, many cold and flu remedies contain decongestants which can cause increases in blood pressure and are therefore not recommended for individuals suffering from hypertension.

32.     Although many manufacturers marketed and sold immediate-release guaifenesin, only Reckitt marketed and sold ERG during the relevant time period.  Immediate-release guaifenesin is not an acceptable substitute for ERG products.  ERG Mucinex® is marketed by Reckitt as providing 12-hours of symptom relief.  Immediate-release products, including all liquid guaifenesin Mucinex® products sold by Reckitt, provide short-term relief and must be taken every 3 to 4 hours to approach the long-lasting benefit of ERG.  A patient neglecting to follow the stringent dosing frequency required of immediate-release guaifenesin products will experience symptom rebound thereby decreasing quality of life.  Although a patient experiencing rebound can take another dose of immediate-release guaifenesin, a delay in symptomatic relief following administration further diminishes the patient's quality of life.  These drawbacks are eliminated or significantly reduced by ERG products.

33.     Reckitt's ability to charge monopoly prices for its ERG products, as opposed to immediate-release guaifenesin products, demonstrates that ERG constitutes a separate market.  During the relevant time period, Reckitt has been able to charge significantly more for its ERG

Mucinex® products than manufacturers selling immediate-release guaifenesin products in the competitive immediate-release market.   As of November 26, 2014, Reckitt was charging consumers forty-three dollars for one-hundred Mucinex® 600 mg ERG tablets (or 43 cents per pill).   At the same time, consumers were being charged approximately sixty dollars for five-hundred twenty-four 600 mg immediate-release guaifenesin tablets (or 11 cents per pill). Consumers could purchase two-hundred 400 mg immediate-release guaifenesin tablets for eleven dollars (or 5 cents per pill).

34.     Reckitt's ability to charge monopoly prices since October 2013 as a result of its monopoly power in the ERG market would have been reduced or eliminated had Reckitt supplied Mutual with ERG product beginning in October 2013, as it was obligated to do.  For example, as of December 17, 2014, Reckitt was substantially reducing the price of Mucinex® ERG products to compete with the ERG product Perrigo was selling that month.  During a prior recent period when Perrigo was not in the market, twenty tablets of 600 mg ERG Mucinex® were selling for fifteen dollars and forty-three cents (or 77 cents per pill) at CVS.  Perrigo's twenty-tablet 600 mg guaifenesin product sold in December 2014 at CVS at a price of eleven dollars and seventy-nine cents (or about 60 cents per pill).  In response, as of December 17, 2014, 600 mg ERG Mucinex® was discounted to twelve dollars and ninety-nine cents (or 65 cents per pill), a discount of approximately sixteen percent.  Reckitt's discounting of Mucinex® in response to competition demonstrates that its ability to charge monopoly prices was dependent on its exclusion of generic competitors from the market.

35.     Since it originally entered the market in 2013, Perrigo's presence in the ERG market has been limited, barely denting Reckitt's ability to exercise its market power over the

vast monopoly of the ERG market. Reckitt maintains market power and continues to benefit by refusing to supply Mutual.

## RECKITT'S BREACH OF THE AGREEMENT HAS HARMED MUTUAL AND MUTUAL IS ENTITLED TO SPECIFIC PERFORMANCE ALONG WITH DAMAGES.

36.    As explained, *supra*, the 600 mg version of the Mucinex® product that Mutual is entitled to purchase from Reckitt is unique. Pursuant to the terms of the Settlement Agreement, Mutual has no adequate remedy at law for the damage it sustains as a consequence of Reckitt's conduct. Indeed, under the terms of their agreement, the parties specifically agreed that, in the event of a breach, the non-breaching party (here, Mutual) would be entitled to specific performance along with any and all other remedies in law and/or equity:

> The Parties agree that there is no adequate remedy at law for the damage which either Party might sustain for breach of this Agreement and, accordingly, each Party shall be entitled, as its option, to specific performance, in addition to any other remedy at law or in equity, to enforce the terms hereof.

Exhibit A, § 26.

37.    The commercial value of the guaifenesin tablets that Reckitt is obligated to provide to Mutual is substantial.

38.    In the absence of Reckitt's breach, Mutual's earlier market entry would have substantially benefited Mutual in its competition with Perrigo. Now, as the result of Reckitt's conduct, Mutual will be at a significant disadvantage when it enters the generic market. Further, Reckitt's conduct has prevented the development of a broad and vibrant generic market to compete with Reckitt's 600 mg Mucinex® product.

39.    Reckitt's refusal to supply Mutual has also prevented Mutual from enjoying the commercial advantage of selling a generic product manufactured by Reckitt. Patients and physicians often prefer to purchase and/or prescribe generic tablets manufactured identically to

10

the corresponding brand product.  Only Reckitt can manufacture ERG that precisely matches the specification of the Mucinex® product.  In view of these preferences, pharmacies and other retail establishments often prefer to source the OTC tablets they sell from generic pharmaceutical companies selling the brand innovator's product.

40.     The financial harm to Mutual resulting from Reckitt's anti-competitive conduct is at least on the order of tens of millions of dollars, and Mutual is entitled to recover the damages it can prove it has suffered as a consequence of Reckitt's conduct.  Money damages, however, will never adequately compensate Mutual for Reckitt's conduct.  For this reason, and for the reasons stated above, both specific performance and damages are appropriate and necessary remedies to compensate Mutual.

**COUNT I**
**Monopolization under the Clayton Act § 4**
**and the Sherman Act § 2 Against Reckitt [Monetary Damages]**

41.     Paragraphs 1 through 40 above are hereby adopted and incorporated by reference as though fully set forth herein.

42.     This claim arises under the Antitrust Laws of the United States, specifically the violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and § 4 of the Clayton Act, 15 U.S.C. § 15.

43.     The exclusionary, unfair, and anticompetitive acts described *supra* constitute acts of monopolization undertaken with the intent to monopolize and preserve a monopoly in the market for ERG in the United States.

44.     Specifically, Reckitt has willfully acquired and/or perpetuated monopoly power in the ERG market through exclusionary, anticompetitive conduct, including, *inter alia*, withholding supply of ERG in violation of its duties under the Settlement Agreement.

11

45.     Reckitt's intent in the anticompetitive acts set forth in paragraphs 17-40 is and was to reduce competition in the ERG market by denying Mutual access to ERG.

46.     The result of Reckitt's anticompetitive acts set forth in paragraphs 17-40 is and was to reduce competition in the ERG market by denying Mutual access to ERG.

47.     By reason of Reckitt's anticompetitive acts, Mutual has been and will continue to be injured in its business and property and is entitled to recover three-fold such actual damages as the jury finds Mutual to have incurred, as well as Mutual's cost of suit, including reasonable attorney's fees, pursuant to the Sherman Antitrust Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. § 15.

## COUNT II
### Monopolization under the Clayton Act § 16
### and the Sherman Act § 2 Against Reckitt [Injunctive Relief]

48.     Paragraphs 1 through 47 above are hereby adopted and incorporated by reference as though fully set forth herein.

49.     This claim arises under the Antitrust Laws of the United States, specifically the violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and § 16 of the Clayton Act, 15 U.S.C. § 26.

50.     By reason of Reckitt's anticompetitive acts, Mutual has been and will continue to be injured in its business and property, faces threat of loss and/or damage, and is therefore entitled to injunctive relief in the form of specific performance of the Agreement, as well as Mutual's cost of suit, including reasonable attorney's fees, pursuant to the Sherman Antitrust Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. § 26.

Case 2:15-cv-00505-PBT   Document 1   Filed 02/03/15   Page 13 of 17

## COUNT III
### Attempt to Monopolize in Violation of the
### Clayton Act §§ 4, 16 and the Sherman Act § 2 Against Reckitt

51.      Paragraphs 1 through 50 above are hereby adopted and incorporated by reference as though fully set forth herein.

52.      This claim arises under the Antitrust Laws of the United States, specifically the violation of § 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, and §§ 4, 16 of the Clayton Act, 15 U.S.C. § 15, 26.

53.      The exclusionary, unfair, and anticompetitive acts described *supra* constitute acts of monopolization undertaken with the specific intent to monopolize and preserve a monopoly in the market for ERG in the United States.  With the specific intent to obtain monopoly power, Reckitt engaged in the exclusionary, unfair, and anticompetitive acts described above, with the dangerous probability of success that it would obtain a monopoly in the relevant market in the United States.

54.      Specifically, Reckitt has willfully acquired and/or perpetuated monopoly power in the ERG market through exclusionary, anticompetitive conduct, including, *inter alia*, withholding supply of ERG in violation of its duties under the Settlement Agreement.

55.      Reckitt's specific intent in the anticompetitive acts set forth in paragraphs 17-40 is and was to reduce competition and build a monopoly in the ERG market by denying Mutual access to ERG.

56.      The result of Reckitt's anticompetitive acts set forth in paragraphs 17-40 is and was to reduce competition and build a monopoly in the ERG market by denying Mutual access to ERG.

57.     The above-described circumstances and conduct by Reckitt constitute an attempt to monopolize in violation of § 2 of the Sherman Act, 15 U.S.C. § 2.

58.     By reason of Reckitt's anticompetitive acts, Mutual has been and will continue to be injured in its business and property and is entitled to recover three-fold such actual damages as the jury finds Mutual to have incurred, to injunctive relief in the form of specific performance of the Agreement, as well as Mutual's cost of suit, including reasonable attorney's fees, pursuant to the Sherman Antitrust Act, 15 U.S.C. § 2, and the Clayton Act, 15 U.S.C. §§ 15, 26.

## COUNT IV
### Breach of Contract

59.     Paragraphs 1 through 58 above are hereby adopted and incorporated by reference as though fully set forth herein.

60.     The Settlement Agreement constitutes a valid and enforceable contract.

61.     Mutual has performed its obligations under the Settlement Agreement.

62.     Under the Settlement Agreement, Mutual may elect, and has elected, to purchase ERG tablets from Reckitt, and Reckitt must supply such tablets.

63.     By the conduct alleged above, Reckitt has materially breached the Agreement.

64.     Mutual has suffered direct and consequential harm as a result of Reckitt's breach and is entitled to recover such direct and consequential damages as the jury finds.

## COUNT V
### Breach of Contract – Specific Performance

65.     Paragraphs 1 through 64 above are hereby adopted and incorporated by reference as though fully set forth herein.

66.     The Settlement Agreement constitutes a valid and enforceable contract.

14

67.     Mutual has at all times performed and remains capable of performing its obligations under the Settlement Agreement.

68.     Under the Settlement Agreement, Mutual may elect, and has elected, to purchase ERG tablets from Reckitt, and Reckitt must supply such tablets.

69.     By the conduct alleged above, Reckitt has materially breached the Settlement Agreement.

70.     The Settlement Agreement provides "there is no adequate remedy at law for the damage which either Party might sustain for breach of this Agreement and, accordingly, each Party shall be entitled, as its option, to specific performance, in addition to any other remedy at law or in equity, to enforce the terms hereof."

71.     By reason of the foregoing, Mutual seeks an Order requiring Reckitt to specifically perform its obligations under the Settlement Agreement.

72.     Without such an Order, Mutual will continue to suffer irreparable harm.

## COUNT VI
### Declaratory Judgment

73.     Paragraphs 1 and 72 above are hereby adopted and incorporated by reference as though fully set forth herein.

74.     The Settlement Agreement constitutes a valid and enforceable contract.

75.     Mutual has at all times performed and remains capable of performing its obligations under the Settlement Agreement.

76.     Under the Settlement Agreement, Mutual may elect to purchase corresponding authorized generic versions of Mucinex® (600 and 1200 mg ER), Mucinex® DM (guaifenesin 600 mg/pseudoephedrine 60 or 120 mg ER tablets) or Mucinex® D (guaifenesin 600

mg/dextromethorphan 30 mg ER tablets) in the event a third-party launches a generic bioequivalent product of any such formulation.

77.     The Settlement Agreement provides "there is no adequate remedy at law for the damage which either Party might sustain for breach of this Agreement and, accordingly, each Party shall be entitled, as its option, to specific performance, in addition to any other remedy at law or in equity, to enforce the terms hereof."

78.     Reckitt has refused to supply Mutual an authorized generic version of Mucinex® 600 mg ER tablets as it is obligated to do under the Settlement Agreement.

79.     Reckitt has alleged the Settlement Agreement does not grant Mutual the right to purchase, and create the obligation for Reckitt to supply, authorized generic versions of its Mucinex® products, including Mucinex®, Mucinex® DM and Mucinex® D.

80.     Third-party manufacturers Perrigo, Watson, and/or Aurobindo have filed Abbreviated New Drug Applications seeking to sell generic product corresponding to the Mucinex® products other than, and in addition to, the 600 mg product, all of which are the subject of the Settlement Agreement, which grants rights to Mutual with regard to all of those products.

81.     The generic products described in the third-party ANDAs do not infringe Reckitt's patents.

82.     By reason of the foregoing, Mutual seeks an Order declaring the validity of the Settlement Agreement and Reckitt's duty to perform by executing a supply agreement and supplying Mutual with authorized generic versions of its Mucinex® products at the time the third-party manufacturers launch products pursuant to their various ANDAs, including Reckitt's

duty to supply an authorized generic version of Mucinex® 600 mg ER in the amounts and at the times requested by Mutual.

83.     Without such an Order, Mutual will suffer irreparable harm.

## DEMAND FOR JUDGMENT AND PRAYER FOR RELIEF

WHEREFORE, Mutual respectfully requests that judgment be granted in its favor and against Reckitt and that this Court award Mutual the following relief:

a)     A judgment awarding Mutual treble its actual damages incurred as a result of Reckitt's violation of the antitrust laws of the United States;

b)     A judgment awarding Mutual both direct and consequential damages flowing from Reckitt's breach of the Settlement Agreement in an amount to be proven at trial, plus interest;

c)     A judgment awarding Mutual specific performance of the Settlement Agreement; and

d)     A judgment awarding Mutual its costs, expenses, reasonable attorneys' fees, and any other relief the Court deems just.

## DEMAND FOR JURY TRIAL

Mutual hereby demands a trial by jury on all issues triable by jury as a matter of right.

Dated: February 3, 2015

By: _____
LANGER GROGAN & DIVER, PC

John J. Grogan
Howard I. Langer
LANGER GROGAN & DIVER, PC
1717 Arch Street, Suite 4130
Philadelphia, PA 19103
Tele:  (215) 320-5662
Fax:  (215) 320-5703